**In re UNITED STATES of America, ex rel. S. PRAWER and COMPANY, et al., Plaintiffs, Appellants,**

**v.**

**FLEET BANK OF MAINE, et al., Defendants, Appellees.**

**No. 93–1766.**

United States Court of Appeals, First Circuit.

Heard Jan. 7, 1994.

Decided May 5, 1994.

---

Jeffrey Bennett with whom Melinda J. Caterine and Herbert H. Bennett & Assoc., P.A., Portland, ME, were on brief, for appellants.

James E. Kaplan with whom Derek P. Langhauser, James E. Kaplan & Associates, P.A. and Julianne Cloutier, Portland, ME, were on brief, for appellee Amy Bierbaum.

Thomas N. O'Connor with whom Donald L. Cabell and Hale and Dorr, Boston, MA, were on brief, for appellees Verrill & Dana, P. Benjamin Zuckerman and Anne M. Dufour.

Joseph F. Shea with whom Paul R. Gupta and Nutter, McClennen & Fish, Boston, MA, were on brief, for appellee RECOLL Management Corp.

John J. Wall, III with whom Thomas F. Monaghan and Monaghan, Leahy, Hochadel & Libby, Portland, ME, were on brief, for appellee Fleet Bank of Me.

Frank W. Hunger, Asst. Atty. Gen., Jay P. McCloskey, U.S. Atty., Bangor, ME, and Douglas N. Letter and Jonathan R. Siegel, Attys., Civ. Div., Dept. of Justice, Washington, DC, on brief, for U.S., amicus curiae.

Before BREYER, Chief Judge,
TORRUELLA and STAHL, Circuit Judges.

STAHL, Circuit Judge.

This appeal arises out of the district court's *sua sponte* dismissal of a *qui tam* action brought by plaintiffs-appellants S. Prawer & Company, Gilbert Prawer, and Harvey Prawer (collectively "Prawer") as relators under the False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.*[1] Plaintiffs primarily[2] contend that the court erred in concluding that 31 U.S.C. § 3730(e)(3),[3] a provision enacted as part of the 1986 amendments to the *qui tam* provisions of the FCA, bars their claim. The issue is one of first impression, as no other court has as yet been called upon to interpret the reach and meaning of this ambiguous provision. After careful consideration of the arguments presented, we reverse.

## I.

### BACKGROUND

#### A. Relevant Factual and Procedural History

The relevant facts and allegations, recounted in the light most favorable to plaintiffs, are as follows.[4] In January 1991, the Maine National Bank ("MNB") was declared insolvent and the Federal Deposit Insurance Corporation ("FDIC") was appointed its receiver. The New Maine National Bank ("NMNB") was established as a bridge bank through which the FDIC would conduct certain MNB-related affairs.

On or about July 12, 1991, the NMNB closed, and the FDIC sold virtually all of its assets to Fleet Bank of Maine ("Fleet"). The contract by which this transfer of assets was effectuated is known as the "Assistance Agreement." *Inter alia,* the Assistance Agreement provided that Fleet had the right to "put," or cause the FDIC to repurchase, any NMNB loans acquired by it pursuant to the Assistance Agreement (provided that said loans did not fall into any one of several exceptional categories described in the Assistance Agreement). Included among the transferred assets were five promissory notes, totalling approximately $1.1 million, given by Prawer to the NMNB. The notes represented the amount Prawer had drawn against a $2 million line of credit extended to it by NMNB.

On July 15, 1991, Prawer entered into a new agreement with Fleet for an unsecured line of credit (known as the "Fleet Credit Facility") which permitted it to draw up to $2 million by executing and/or renewing consecutive, unsecured 90–day term notes on a

---

1. Because of the length of the statutory provisions relevant to this appeal, we have attached them in an appendix to our opinion.

2. Employing an extremely literal reading of 31 U.S.C. § 3730(b)(1) (an action brought under the FCA "may be dismissed only if the court and the Attorney General give written consent to the dismissal and their reasons for consenting"), plaintiffs also argue that the court erred in proceeding *sua sponte* and dismissing this action without the approval of the Attorney General. Because, as will be discussed *infra,* we believe the court erred in determining that this action was jurisdictionally barred, we need not and do not address the merits of this somewhat dubious assertion. *See* Fed.R.Civ.P. 12(h)(3) ("Whenever it appears by suggestion of the parties *or otherwise* that the court lacks jurisdiction of the subject matter, the court *shall* dismiss the action.") (emphasis added).

3. Section 3730(e)(3) states: "In no event may a person bring [a *qui tam* action] which is based upon allegations or transactions which are the subject of a civil suit or an administrative civil money penalty proceeding in which the Government is already a party."

4. A few of the following facts and allegations appear only in plaintiffs' brief. Because they help shed light on the convoluted factual underpinnings of this litigation and have no effect on our resolution of the question before us, we have included them in our recitation of the case's background. Our inclusion of these facts and allegations should not, however, be construed either as an endorsement of their veracity or as an indication that they are well-pleaded.

note-by-note basis. Prawer utilized this new line of credit from Fleet to satisfy fully its obligations under each of the five outstanding NMNB notes. By May 5, 1992, Prawer had drawn $1.6 million against its $2 million line of credit under the Fleet Credit Facility. These borrowings were evidenced by seven unsecured 90–day term notes.

Meanwhile, on April 30, 1992, Prawer sold virtually all of its then-existing assets to C & S Wholesale Grocers, Inc. ("C & S"). Gilbert Prawer informed Fleet of the sale on May 1, 1992. On May 6, 1992, pursuant to the Assistance Agreement, Fleet put certain Prawer notes back to the FDIC. The parties hotly contest, however, whether any of the notes were "putable" under the terms of the Assistance Agreement.[5]

### 1. The Collection Case

Subsequently, in November 1992, the FDIC commenced an action against Prawer, C & S, and a number of individual defendants to collect upon the notes put back to it pursuant to the Assistance Agreement. The complaint in that action not only sought enforcement of the notes, but also alleged that the April 30, 1992, sale of Prawer's assets to C & S constituted a fraudulent conveyance and violated Maine's Bulk Sale Act. More specifically, the FDIC contended that Prawer had become insolvent, and had peddled its assets for less than full value in order to satisfy its debts to certain creditors. Accordingly, the complaint sought damages beyond the amount allegedly outstanding on the notes.

Prawer responded to this complaint with several affirmative defenses and counterclaims, as well as filing a third-party complaint against Fleet and Recoll Management Corporation ("Recoll"), a Fleet subsidiary which had, pursuant to an agreement with the FDIC, been seeking to collect upon the notes which were put back to the FDIC. A variety of charges were made in these defenses, counterclaims, and third-party claims; among these was an assertion that the notes were not putable to the FDIC pursuant to the Assistance Agreement. *But see infra* note 6.

At oral argument, the parties represented that, since the filing of this case, the Collection case has settled.

### 2. The *Qui Tam* Case

On June 21, 1993, plaintiffs filed the instant *qui tam* action. In their complaint, plaintiffs contended that the named defendants—Fleet, Recoll, Verrill & Dana (the law firm that served as legal counsel to Fleet, Recoll, and the FDIC at all times relevant to this matter), P. Benjamin Zuckerman and Anne M. Dufour (the Verrill & Dana lawyers involved in this matter), and Amy Bierbaum (an FDIC staff attorney)—"created and used, or caused to be created and used, false records and statements designed to defraud the Government into paying Fleet approximately $1.6 million" for the Prawer notes pursuant to the put-back provisions of the Assistance Agreement.

Nine days later, on June 30, 1993, the district court *sua sponte* dismissed plaintiffs' complaint. In so doing, the court relied upon § 3730(e)(3), *see supra* note 3, finding that (1) the allegations made and transactions implicated in plaintiffs' complaint already were at issue (as defenses) in the Collection case; and (2) the "government," in the person of the FDIC, was a party to that action. *See United States ex rel. S. Prawer & Co. v. Fleet Bank of Maine*, 825 F.Supp. 339 (D.Me. 1993).

Plaintiffs moved the court to reconsider its *sua sponte* order of dismissal, arguing, *inter alia*, that (1) the "government," for purposes of § 3730(e)(3), was not a party to the Collection case; and (2) the *qui tam* action was not "based upon allegations or transactions which are the subject of" the Collection case. In a comprehensive memorandum of decision, the court rejected both of these arguments (as well as all other arguments made in plaintiffs' motion). In so doing, however, the court receded slightly from its original holding on the question of whether there was

---

**5.** It has been and is plaintiffs' position that *none* of the notes were properly putable; defendants apparently now concede that *some* of the notes were not putable because plaintiffs' obligations thereunder had been fully satisfied, but argue that certain other notes were, in fact, putable.

an identity between the allegations and transactions which were "the subject of" the Collection case and those that served as the basis for the *qui tam* action. Instead, the court found:

> To the extent that defenses based upon the allegations of the *qui tam* complaint are not pleaded in the related civil action, that is entirely the result of the conscious decision of counsel for the defendants there (and Plaintiffs here) to abjure their pleading. Clearly the factual predicate for the false claims alleged in the *qui tam* action form the basis for assertion of viable defenses to the claims made against the defendant S. Prawer & Company on the notes in the related civil action. An effective defense to those claims would require that those defenses be pleaded there if counsel, in good faith, believe the facts put forth here.... This Court believes that the proper construction of [§ 3730(e)(3) ] requires that it be read broadly enough to encompass not only allegations and transactions actually put in issue by the litigants in the related civil suit but any allegations or transactions that could legitimately be made a subject (*e.g.*, [sic] be put in issue) of that suit in the regular course of its development.

*United States ex rel. S. Prawer & Co. v. Fleet Bank of Maine*, Civ. No. 93–165–P–C, 1993 WL 668988, slip op. at 3–4 (D.Me. July 12, 1993) (footnote omitted).[6] Accordingly, the court denied plaintiffs' motion. *Id.* at 9.

### B. The Statutory Framework

Because our resolution of the issue presented in this appeal necessarily is informed by Congress's intent in enacting the 1986 amendments to the FCA's *qui tam* provisions, a brief historical overview of the statute is in order. The FCA's *qui tam*[7] provisions, *see generally* 31 U.S.C. § 3730(b)–(g), empower private persons, known as "relators," (1) to sue, on behalf of the government, persons who *knowingly* have presented the government with false or fraudulent *claims* (as the highlighted terms are defined by 31 U.S.C. § 3729); and (2) to share in any proceeds ultimately recovered as a result of such suits, *see generally* 31 U.S.C. § 3730(d). Since its enactment in 1863,[8] the FCA has contained several different *qui tam* provisions. The original provisions contained no significant jurisdictional limitations and did not preclude plaintiffs from bringing suit on the basis of information already in the government's possession. *Quinn*, 14 F.3d at 649. Despite this invitation for abuse, however, the provisions were used sparingly in the first fifty years of their existence. *Id.* (citing *United States ex rel. LaValley v. First Nat'l Bank of Boston*, 707 F.Supp. 1351, 1354 (D.Mass.1988)).

During the New Deal and World War II, there was a notable increase in the number of contracts awarded by the government to private individuals and entities. *Id.* Along with this increase came a concomitant surge in the number of *qui tam* actions brought by relators under the FCA. *See id.* This litigational surge, in turn, brought to the fore the fact that the *qui tam* provisions then in effect were too susceptible to abuse by "parasitic" relators. The era of parasitic *qui tam* ac-

---

6. Our review of the pleadings in the Collection case reveals that it is a close question as to whether the illegitimacy of the put (on grounds of fraud) actually was raised therein *as an affirmative defense.* However, because we find that § 3730(e)(3) does not bar this action even if the fraud claim was so raised, we will assume this fact *arguendo* and will not address the district court's ruling that the statute also bars *qui tam* actions based upon allegations or transactions that *could have* been raised in another civil action or administrative money penalty proceeding.

7. *"Qui tam"* is an abbreviation for *"qui tam pro domino rege quam pro seipso,"* which literally means "he who as much for the king as for himself." *United States ex rel. Springfield Termi-*

*nal Ry. Co. v. Quinn*, 14 F.3d 645, 647 n. 1 (D.C.Cir.1994) (citing John T. Boese, *Civil False Claims and Qui Tam Actions*, 1–6 (1993)). *Qui tam* provisions, which historically have allowed parties to initiate suit on the government's behalf and to share in the recovery as bounty, first gained popularity in thirteenth-century England as a supplement to ineffective law enforcement. *Id.* (citing Note, *The History and Development of Qui Tam*, 1972 Wash.U.L.Q. 81, 86–87 and Boese, *supra*, at 1–6).

8. The FCA originally was enacted "in order to combat rampant fraud in Civil War defense contracts." *See* S.Rep. No. 345, 99th Cong., 2d Sess. 8, *reprinted in* 1986 U.S.C.C.A.N. 5266, 5273.

tions reached its apex in *United States ex rel. Marcus v. Hess,* 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed. 443 (1943), where the Supreme Court allowed a relator to proceed with a *qui tam* suit that was based *solely* on the allegations of a criminal indictment to which defendants already had pleaded *nolo contendere* (and as a result of which defendants already had paid fines totalling $54,000). *See Quinn,* 14 F.3d at 649–50; *see also* S.Rep. No. 345, 99th Cong., 2d Sess. 10, *reprinted in* 1986 U.S.C.C.A.N. at 5275. In rejecting the government's argument that permitting the action to proceed would thwart the spirit of the FCA, the Court stated:

> Even if ... petitioner has contributed nothing to the discovery of this crime, he has contributed much to accomplishing one of the purposes for which the [FCA] was passed. The suit results in a net recovery to the government of $150,000, three times as much as fines imposed in the criminal proceedings.

*Hess,* 317 U.S. at 545, 63 S.Ct. at 384. Accordingly, because the Court found neither a bar to the suit in the text of the FCA nor an intent to impose one in the Act's legislative history, *id.* at 546, 63 S.Ct. at 385, it declined to establish a judicial bar on its own initiative, *Quinn,* 14 F.3d at 650.

In response to public outcry over the *Hess* decision, Congress acted quickly to restrict the universe of litigants who could avail themselves of the FCA's *qui tam* provisions. *Id.* at 650. The 1943 amendments to these provisions, signed into law by President Roosevelt on December 21, 1943, codified this restriction. *See* S.Rep. No. 345, 99th Cong., 2d Sess. 12, *reprinted in* 1986 U.S.C.C.A.N. at 5277. The amendments reflected compromise between the House and Senate; the House bill would have repealed the *qui tam* provisions altogether, while the Senate bill would have precluded suits which were based upon information already in the government's possession unless the information underlying the suit was "original with [the] person [bringing the suit]." *Quinn,* 14 F.3d at 650 (quoting 89 Cong.Rec. 510, 744 (daily ed. December 16, 1943)); *see also* S.Rep. No. 345, 99th Cong., 2d Sess. 11–12, *reprinted in* 1986 U.S.C.C.A.N. at 5276–77.

Although the Senate's approach largely prevailed, the provision of the Senate bill expressly permitting the "original source" of information to bring a *qui tam* action was dropped in conference. *See* S.Rep. No. 345, 99th Cong., 2d Sess. 12, *reprinted in* 1986 U.S.C.C.A.N. at 5277. As a result, the final 1943 legislation precluded all *qui tam* actions "based on evidence or information the Government had when the action was brought." 31 U.S.C. § 3730(b)(4) (1982) (superseded); *see also Quinn,* 14 F.3d at 650.

Over the next four decades, courts strictly construed the jurisdictional bar established in the 1943 amendments. *See* S.Rep. No. 345, 99th Cong., 2d Sess. 12, *reprinted in* 1986 U.S.C.C.A.N. at 5277. Unsurprisingly, there was a corresponding decrease in the use of the *qui tam* provisions to enforce the FCA during this same period. *Quinn,* 14 F.3d at 650 (citing Boese, *supra* note 7, at 1–12). If the *Hess* decision marks the highpoint of the regime of liberal litigation under the *qui tam* provisions, the Seventh Circuit's decision in *United States, ex rel. State of Wisconsin v. Dean,* 729 F.2d 1100 (7th Cir. 1984), may well mark the point of greatest retreat from *Hess. See Quinn,* 14 F.3d at 650.

In *Dean,* the Seventh Circuit was faced with the question of whether the State of Wisconsin should be allowed to act as a *qui tam* relator in a Medicaid fraud action where the State, in accordance with federal regulations, had already reported the fraud to the federal government. *See Dean,* 729 F.2d at 1102–04. It was undisputed that (1) the fraud investigation had been conducted by the State; (2) the State was an original source of the information provided; and (3) the State had been required to report the fraud. *See id.* at 1102–03 and n. 2. Nonetheless, noting the unambiguous language of the FCA, the disappearance of the original source provision from the 1943 Senate bill, and the absence of any basis for finding an exception to the statutory bar where the relator was required to report the information, the court rejected the contentions of both the State and the federal government, which had filed an *amicus* brief on behalf of the State, that the FCA's legislative history

evinced a " 'clearly expressed legislative intention' " to allow the action to go forward. *See id.* at 1104–05 (quoting *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980)). Accordingly, it reversed the decision of the district court, which had found such an intention. *See id.* at 1104–06.

In the wake of the Seventh Circuit's opinion in *Dean,* there was once again a perception that the *qui tam* provisions were in need of alteration. *See* S.Rep. No. 345, 99th Cong., 2d Sess. 13, *reprinted in* 1986 U.S.C.C.A.N. at 5278 (recounting that the National Association of Attorneys General adopted a resolution calling on Congress to rectify "the unfortunate result" of the *Dean* decision). Ultimately, Congress responded with the False Claims Amendments Act of 1986, the stated purpose of which was " 'to enhance the Government's ability to recover losses sustained as a result of fraud against the Government.' " *Quinn,* 14 F.3d at 650 (quoting S.Rep. No. 345, 99th Cong., 2d Sess. 1, *reprinted in* 1986 U.S.C.C.A.N. at 5266). Concerned that sophisticated and widespread fraud was depleting the national fisc, the drafters of the 1986 amendments concluded that " 'only a coordinated effort of both the Government and the citizenry will decrease this wave of defrauding public funds. Accordingly, the Senate bill increases incentives, financial and otherwise, for private individuals to bring suits on behalf of the Government.' " *Id.* at 650–51 (quoting S.Rep. No. 345, 99th Cong., 2d Sess. 1–2, *reprinted in* 1986 U.S.C.C.A.N. at 5266–67).

The 1986 amendments changed the FCA's *qui tam* provisions in several respects. On the one hand, they contained several provisions designed to "encourage more private enforcement suits." *See id.* at 651 (quoting S.Rep. No. 345, 99th Cong., 2d Sess. 23–24, *reprinted in* 1986 U.S.C.C.A.N. at 5288–89). Among these are the original source provision eliminated from the 1943 Senate bill, a provision increasing monetary awards, a lower burden of proof, and a provision allowing *qui tam* plaintiffs to continue to participate in the actions after intervention by the government. *Id.* (citing *United States ex rel.*

*Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co.,* 944 F.2d 1149, 1154 (3d Cir.1991)). On the other hand, Congress also enacted new provisions designed, *inter alia,* to continue the prohibition against strictly parasitic lawsuits. *See generally* 31 U.S.C. § 3730(e); *see also Quinn,* 14 F.3d at 651.

We think Judge Wald summarized rather well the objectives of the 1986 amendments:

> The history of the FCA *qui tam* provisions demonstrates repeated congressional efforts to walk a fine line between encouraging whistle-blowing and discouraging opportunistic behavior. The 1986 amendments inevitably reflect the long process of trial and error that engendered them. They must be analyzed in the context of these twin goals of rejecting suits which the government is capable of pursuing itself, while promoting those which the government is not equipped to bring on its own.

*Id.*

## II.

### DISCUSSION

#### A. The Jurisdictional Question

■ As they did before the district court, plaintiffs here argue that (1) the FDIC is not, for purposes of § 3730(e)(3), "the government"; and (2) the instant action is not "based upon allegations or transactions which are the subject of" the Collection case. *See supra* note 3. Because we believe that the second of these two contentions is ultimately persuasive, and that the statutory bar of § 3730(e)(3) therefore does not apply, we turn our sights to this provision of the statute.

We start by noting the obvious: the breadth with which we should read the phrase "allegations or transactions which are *the subject of* a civil suit" is not readily apparent from the text of the statute. Defendants' argument that, because plaintiffs denied the legitimacy of the put transaction (alleging fraud) in the Collection case, there is an identity between the allegations and transactions which were at least a "subject

of" that case and the fraud allegations which serve as "the basis" of this case certainly strikes us as being anchored upon a plausible construction of the phrase "the subject of" in § 3730(e)(3). So too, however, does plaintiffs' argument that, when viewed at an appropriate level of specificity, the transactions and allegations which are "*the* subject of" the Collection case should and must be seen only as Prawer's (1) making of the sued-upon notes, and (2) alleged failure to satisfy them. Therefore, we regard the statute as ambiguous.

 When faced with a facially ambiguous statutory provision, we look to the statute as a whole and the history of its enactment in order to glean congressional intent. *See, e.g., Concrete Pipe & Prods., Inc. v. Construction Laborers Pension Trust,* — U.S. ——, ——, 113 S.Ct. 2264, 2281, 124 L.Ed.2d 539 (1993); *Gaskell v. Harvard Coop. Soc'y,* 3 F.3d 495, 499 (1st Cir.1993); *United States v. Alky Enters., Inc.,* 969 F.2d 1309, 1314 (1st Cir.1992). Here, we think the rather easily-discerned purposes underlying the 1986 amendments militate strongly in favor of plaintiffs' reading of the phrase.

As Judge Wald observed in the *Quinn* decision (and as we have noted above, *see supra* at 326–27), "[t]he history of the FCA *qui tam* provisions demonstrates repeated congressional efforts to walk a fine line between encouraging whistle-blowing and discouraging opportunistic behavior," *Quinn,* 14 F.3d at 651. Clearly, the 1986 amendments, insofar as they were responding to a regime in which the preclusion of opportunistic litigation was too heavily weighted, had as perhaps their central purpose an expansion of opportunities and incentives for private citizens with knowledge of fraud against the government to come forward with that information. *See* S.Rep. No. 345, 99th Cong., 2d Sess. 1, *reprinted in* 1986 U.S.C.C.A.N. at 5266 ("The purpose of [the 1986 amendments] is to enhance the Government's ability to recover losses sustained as a result of fraud against the Government."); *id.* at 1–2, *reprinted in* 1986 U.S.C.C.A.N. at 5266–67 ("The proposed legislation seeks not only to provide the Government's law enforcers with more effective tools, but to encourage any

individual knowing of Government fraud to bring that information forward."); *id.* at 2, *reprinted in* 1986 U.S.C.C.A.N. at 5267 ("[The 1986 amendments] increase[ ] incentives, financial and otherwise, for private individuals to bring suits on behalf of the Government."). Indeed, it is apparent that a primary objective of the 1986 amendments, as revealed in the above-quoted Senate Report and in published hearings on the proposed legislation, was to encourage and provide incentives for the bringing of *qui tam* actions in *all but* the several circumstances delineated in § 3730(e). *See generally id.* at 1–17, *reprinted in* 1986 U.S.C.C.A.N. at 5266–82; *see also generally False Claims Reform Act: Hearing Before the Subcomm. on Admin. Practice and Proc. of the Senate Comm. on the Judiciary,* 99th Cong., 1st Sess. (Sept. 17, 1985); *False Claims Act Amendments: Hearings Before the Subcomm. on Admin. Law and Governmental Relations of the Comm. on the Judiciary House of Representatives,* 99th Cong., 2d Sess. (February 5 and 6, 1986).

 Obviously, then, the question becomes: What circumstances does § 3730(e)(3) seek to avoid? It seems clear that the answer to this question is circumstances involving "parasitic" *qui tam* actions which are not otherwise barred by § 3730(e). *Cf., e.g., Quinn,* 14 F.3d at 651 (interpreting the 1986 amendments as "still another congressional effort to reconcile avoidance of parasitism and encouragement of legitimate citizen enforcement actions"). Thus, when it is not clear whether or not a *qui tam* action should be barred by the ambiguous provision precluding the action if it is "based upon transactions or allegations which are the subject of" another suit or proceeding in which the government is a party, we think that a court should look first to whether the two cases can properly be viewed as having the qualities of a host/parasite relationship. In answering this question, we think it would be useful for the court to be guided by the definition of the word "parasite," and ask whether the *qui tam* case is receiving "support, advantage, or the like" from the "host" case (in which the government is a party) "without giving any useful or proper return"

to the government (or at least having the potential to do so). *See Random House Dictionary of the English Language* 1409 (2d ed. unabridged 1987). If this question is answered in the affirmative, the court may properly conclude that there is an identity between "the basis" of the *qui tam* action and "the subject of" the other suit or proceeding; if this question is answered in the negative, the court similarly may gather that such an identity is lacking.

Of course, because Congress's intuition as to what constitutes "potential useful and proper return" to the government clearly changed with the enactment of the 1986 amendments, our endorsement of this inquiry would beg the question entirely without two further points. While the question of what now constitutes potential useful or proper return to the government will not always be easily answered and must necessarily be addressed on a case-by-case basis, we believe it important to note that one of the most important perceptions precipitating the 1986 amendments was that actions which had the potential of providing such return were being precluded by the then-existing statutory regime. In light of this, we feel courts should proceed with caution before applying the statutory bar of § 3730(e)(3) in ambiguous circumstances.

On the other hand, we think it clear that a *qui tam* suit's potential for adding funds to the government's coffers, *without more*, should not be regarded as constituting useful or proper return to the government. In enacting the 1943 amendments to the FCA's *qui tam* provisions, Congress clearly rejected the view (espoused in *Hess,* 317 U.S. at 545, 63 S.Ct. at 384) that this potentiality *alone* was sufficient to render non-parasitic (and therefore viable) a *qui tam* action which is *completely* derivative of another case in which the government is a party. And, while the 1986 amendments certainly reveal an intent to recharacterize as "non-parasitic" actions which would have been considered "parasitic" under the 1943–1986 regime (which regarded as "parasitic" *all qui tam*

actions based upon evidence or information the government had when the action was brought), nothing in these amendments suggests a congressional desire to return to the 1863–1943, pre-*Hess* regime.

Turning to the instant appeal, we think that two facts combine to compel the conclusion that this case has the potential of providing "useful or proper return" to the government, and therefore is not "parasitic" of the Collection case. First, the FDIC (which we shall assume *arguendo* to be "the government" within the meaning of § 3730(e)(3)) was *not* proceeding against the defendants to this action, for fraud or otherwise, in the Collection case.[9] Therefore, because this case is seeking to remedy fraud that the government has not yet attempted to remedy, it is, as a threshold matter, wholly unlike the one the drafters of § 3730(e)(3) almost certainly had in mind and sought to preclude (i.e., a *qui tam* action based upon allegations or transactions pleaded *by the government* in an attempt to recover for fraud committed against it).

Second, it does not appear that the FDIC *could have* sued Fleet for fraud as part of the Collection case *as that case was constituted.* Had it attempted to do so, the FDIC not only would have been asserting, as a plaintiff, both the validity and the invalidity of the sued-upon notes against separate defendants in the same lawsuit, but it also seemingly would have been claiming under an entirely different "transaction or occurrence" (i.e., the put-back of the notes pursuant to the Assistance Agreement) than the one (Prawer's making of the notes and alleged failure to satisfy them) which was the subject matter of the Collection case. This scenario is not, of course, allowed under the Federal Rules of Civil Procedure. *See* Fed. R.Civ.P. 14(a) ("The plaintiff may assert any claim against the third-party defendant arising out of the transaction or occurrence *that is the subject matter of the plaintiff's claim against the third-party plaintiff....*") (emphasis supplied); *see also* C. Wright, A. Miller, and M. Kane, *Federal Practice and Pro-*

---

**9.** Of the defendants named here, only Fleet and Recoll were parties to the Collection case. Moreover, Fleet and Recoll were only parties to

that case because *Prawer* had filed a series of third-party claims against them.

*cedure*, § 1459 at 449 n. 4 (1990) ("Plaintiff cannot in effect substitute, as against the third-party defendant, another cause of action for that originally commenced by him.") (citing *Welder v. Washington Temperance Ass'n*, 16 F.R.D. 18, 20 (D.Minn.1954)).

■ Another way to look at this question is to determine whether defendants' construction of this ambiguous statutory provision would further the purposes underlying the 1986 amendments. At oral argument, when pressed on this point, defendants' attorneys acknowledged that their position necessarily was predicated upon the view that *qui tam* actions were to be avoided once the government had notice of the transactions or allegations giving rise to the actions.[10] However, such a view must be rejected for two reasons: (1) Congress has explicitly deemed a "notice" regime insufficient to protect the government against false claims (indeed, it was *precisely such a regime* that Congress sought to abandon in enacting the 1986 amendments); and (2) Congress, when it wants to establish a notice regime, knows how to do so in far less ambiguous terms than those utilized in § 3730(e)(3), *see* 31 U.S.C. § 3730(e)(2)(A) (precluding *qui tam* actions brought against members of Congress, members of the judiciary, or senior executive branch officials "if the action is based upon evidence or information known to the Government when the action was brought"); 31 U.S.C. § 3730(b)(4) (1982) (superseded) (precluding all *qui tam* actions "based on evidence or information the Government had when the action was brought").

To sum up, the instant *qui tam* action has the potential for providing "useful or proper return" to the government in at least two significant ways: (1) it seeks recovery from alleged defrauders of the government for fraud that has not yet been the subject of a claim by the government; and (2) it has the potential to restore money to the public fisc that would not and could not have been restored in the Collection case. As such, we do not think that it can be characterized as "parasitic." Therefore, we believe that it

would undermine the purposes of the 1986 amendments to construe this action as being "based upon allegations or transactions which are the subject of" the Collection case.

### B. Other Matters

We recognize that defendants have made several alternative arguments for affirmance in their respective briefs. We also recognize that plaintiffs have moved to dismiss Fleet and Recoll from this action. Given the nascent state of this litigation (and all that this implies—including an undeveloped record, an inadequate period of time for plaintiffs to have cured any defects in their pleadings, and the lack of a full opportunity for the government to have reviewed the pleadings, *see* 31 U.S.C. § 3730(b)), however, we decline either to delve into defendants' other arguments or to grant plaintiffs' motion to dismiss at this time. Instead, we leave these matters for the district court to decide *after* the government determines whether or not it will intervene. So too do we leave to the district court all requests for costs arising out of claims that this action is frivolous and has been undertaken in bad faith. To the extent that any such request may be predicated on an argument that this appeal was frivolous, it is rejected.

### III.

### CONCLUSION

For the reasons explained above, we do not think that the instant *qui tam* action "is based upon allegations or transactions which are the subject of" the Collection case. Accordingly, the district court erred in dismissing *sua sponte* plaintiffs' complaint on the basis of 31 U.S.C. § 3730(e)(3). The judgment of the district court therefore is vacated.

***Vacated and remanded. No costs.***

### APPENDIX

### 31 U.S.C.S. § 3729

§ 3729. False claims

(a) **Liability for certain acts.** Any person who—

---

10. After all, given the facts noted in the preceding two paragraphs, the most defendants here can argue is that the government was, in the

Collection case, provided with notice of the allegedly fraudulent nature of put-back transaction.

(1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;

(2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;

(3) [Unchanged]

(4) has possession, custody, or control of property or money used, or to be used, by the Government and, intending to defraud the Government or willfully to conceal the property, delivers, or causes to be delivered, less property than the amount for which the person receives a certificate or receipt;

(5) authorized to make or deliver a document certifying receipt of property used, or to be used, by the Government and, intending to defraud the Government, makes or delivers the receipt without completely knowing that the information on the receipt is true;

(6) knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the Government, or a member of the Armed Forces, who lawfully may not sell or pledge the property; or

(7) knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government,

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person, except that if the court finds that—

(A) the person committing the violation of this subsection furnished officials of the United States responsible for investigating false claims violations with all information known to such person about the violation within 30 days after the date on which the defendant first obtained the information;

(B) such person fully cooperated with any Government investigation of such violation; and

(C) at the time such person furnished the United States with the information about the violation, no criminal prosecution, civil action, or administrative action had commenced under this title with respect to such violation, and the person did not have actual knowledge of the existence of an investigation into such violation;

the court may assess not less than 2 times the amount of damages which the Government sustains because of the act of the person. A person violating this subsection shall also be liable to the United States Government for the costs of a civil action brought to recover any such penalty or damages.

**(b) Knowing and knowingly defined.** For purposes of this section, the terms "knowing" and "knowingly" mean that a person, with respect to information—

(1) has actual knowledge of the information;

(2) acts in deliberate ignorance of the truth or falsity of the information; or

(3) acts in reckless disregard of the truth or falsity of the information,

and no proof of specific intent to defraud is required.

**(c) Claim defined.** For purposes of this section, "claim" includes any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded.

**(d) Exemption from disclosure.** Any information furnished pursuant to subparagraphs (A) through (C) of subsection (a) shall be exempt from disclosure under section 552 of title 5.

**(e) Exclusion.** This section does not apply to claims, records, or statements made under the Internal Revenue Code of 1954.

(As amended Oct. 27, 1986, P.L. 99–562, § 2, 100 Stat. 3153.)

three times the amount of the damages the Government sustains because of the act of the person, and costs of the civil action.".

## HISTORY; ANCILLARY LAWS AND DIRECTIVES

**Amendments:**

**1986.** Act Oct. 27, 1986, substituted "(a) Liability for certain acts. Any person who—" for the introductory matter which read: "A person not a member of an armed force of the United States is liable to the United States Government for a civil penalty of $2,000, an amount equal to 2 times the amount of damages the Government sustains because of the act of that person, and costs of the civil action, if the person—"; in subsec. (a), as so designated, in para. (1), substituted "United States Government or a member of the Armed Forces of the United States" for "Government or a member of an armed force", in para. (2), inserted "by the Government", in para. (4), deleted "public" following "control of" and substituted "by the Government" for "in an armed force", in para. (5), substituted "by the Government" for "in an armed force" and deleted "or" following the concluding semicolon, in para. (6), substituted "an officer or employee of the Government, or member of the Armed Forces," for "a member of an armed force" and substituted "; or" for the concluding period, and added para. (7), the intermediate matter following such para., subparas. (A)–(C), and the concluding matter; and added subsecs. (b)–(e).

**Other provisions:**

**Increased civil penalties for false claims in defense procurement.** Act Nov. 8, 1985, P.L. 99–145, Title IX, Part C, § 931(b), 99 Stat. 699, applicable to claims made or presented on or after enactment on Nov. 8, 1985, as provided by § 931(c) of such Act, which appears as 18 USCS 287 note, provides: "Notwithstanding section 3729 of title 31, United States Code [this section], the amount of the liability under that section in the case of a person who makes a false claim related to a contract with the Department of Defense shall be a civil penalty of $2,000, an amount equal to

## CODE OF FEDERAL REGULATIONS

Add:

32 CFR Part 516.

38 CFR Part 21.

## RESEARCH GUIDE

**Federal Procedure L Ed:**

4A Fed Proc L Ed, Banking and Financing § 8:1554.

5A Fed Proc L Ed, Bonds, Civil Fines, and Forfeitures §§ 10:46, 75, 86, 87.

Farms, Ranches, and Agricultural Products, Fed Proc, L Ed § 34:945.

Pleadings and Motions, Fed Proc, L Ed, § 62:127.

Social Security and Medicare, Fed Proc, L Ed, § 71:696.

**Am Jur:**

9B Am Jur 2d, Bankruptcy § 3155.

19 Am Jur 2d, Corporations § 2136.

32 Am Jur 2d, False Pretenses, §§ 92, 96.

**Forms:**

10 Federal Procedural Forms L Ed, Government Contracts § 34:10.

**Annotations:**

Corporation's vicarious liability for fraud of its agent under False Claims Act (31 USCS §§ 3729–3733). 107 ALR Fed 665.

**Law Review Articles:**

Waldrop, The False Claims Act and the Proposed Program Fraud Civil Remedies Act: Complementary Partners in the Prevention of Federal Program Fraud. 73 Ky L J 967, 1984–85.

## INTERPRETIVE NOTES AND DECISIONS

65.3. Witnesses

65.5. Collateral estoppel

68.5. New trial

## § 3730. Civil actions for false claims

**(a) Responsibilities of the Attorney General.** The Attorney General diligently shall investigate a violation under section 3729. If the Attorney General finds that a person has violated or is violating section 3729, the Attorney General may bring a civil action under this section against the person.

**(b) Actions by private persons.** (1) A person may bring a civil action for a violation of section 3729 for the person and for the United States Government. The action shall be brought in the name of the Government. The action may be dismissed only if the court and the Attorney General give written consent to the dismissal and their reasons for consenting.

(2) A copy of the complaint and written disclosure of substantially all material evidence and information the person possesses shall be served on the Government pursuant to Rule 4(d)(4) of the Federal Rules of Civil Procedure. The complaint shall be filed in camera, shall remain under seal for at least 60 days, and shall not be served on the defendant until the court so orders. The Government may elect to intervene and proceed with the action within 60 days after it receives both the complaint and the material evidence and information.

(3) The Government may, for good cause shown, move the court for extensions of the time during which the complaint remains under seal under paragraph (2). Any such motions may be supported by affidavits or other submissions in camera. The defendant shall not be required to respond to any complaint filed under this section until 20 days after the complaint is unsealed and served upon the defendant pursuant to Rule 4 of the Federal Rules of Civil Procedure.

(4) Before the expiration of the 60–day period or any extensions obtained under paragraph (3), the Government shall—

(A) proceed with the action, in which case the action shall be conducted by the Government; or

(B) notify the court that it declines to take over the action, in which case the person bringing the action shall have the right to conduct the action.

(5) When a person brings an action under this subsection, no person other than the Government may intervene or bring a related action based on the facts underlying the pending action.

**(c) Rights of the parties to qui tam actions.** (1) If the Government proceeds with the action, it shall have the primary responsibility for prosecuting the action, and shall not be bound by an act of the person bringing the action. Such person shall have the right to continue as a party to the action, subject to the limitations set forth in paragraph (2).

(2)(A) The Government may dismiss the action notwithstanding the objections of the person initiating the action if the person has been notified by the Government of the filing of the motion and the court has provided the person with an opportunity for a hearing on the motion.

(B) The Government may settle the action with the defendant notwithstanding the objections of the person initiating the action if the court determines, after a hearing, that the proposed settlement is fair, adequate, and reasonable under all the circumstances. Upon a showing of good cause, such hearing may be held in camera.

(C) Upon a showing by the Government that unrestricted participation during the course of the litigation by the person initiating the action would interfere with or unduly delay the Government's prosecution of the case, or would be repetitious, irrelevant, or for purposes of harassment, the court may, in its discretion, impose limitations on the person's participation, such as—

(i) limiting the number of witnesses the person may call;

(ii) limiting the length of the testimony of such witnesses;

(iii) limiting the person's cross-examination of witnesses; or

(iv) otherwise limiting the participation by the person in the litigation.

(D) Upon a showing by the defendant that unrestricted participation during the course of the litigation by the person initiating the action would be for purposes of harassment or would cause the defendant undue burden or unnecessary expense, the court may limit the participation by the person in the litigation.

(3) If the Government elects not to proceed with the action, the person who initiated the action shall have the right to conduct the action. If the Government so requests, it shall be served with copies of all pleadings filed in the action and shall be supplied with copies of all deposition transcripts (at the Government's expense). When a person proceeds with the action, the court, without limiting the status and rights of the person initiating the action, may nevertheless permit the Government to intervene at a later date upon a showing of good cause.

(4) Whether or not the Government proceeds with the action, upon a showing by the Government that certain actions of discovery by the person initiating the action would interfere with the Government's investigation or prosecution of a criminal or civil matter arising out of the same facts, the court may stay such discovery for a period of not more than 60 days. Such a showing shall be conducted in camera. The court may extend the 60–day period upon a further showing in camera that the Government has pursued the criminal or civil investigation or proceedings with reasonable diligence and any proposed discovery in the civil action will interfere with the ongoing criminal or civil investigation or proceedings.

(5) Notwithstanding subsection (b), the Government may elect to pursue its claim through any alternate remedy available to the Government, including any administrative proceeding to determine a civil money penalty. If any such alternate remedy is pursued in another proceeding, the person initiating the action shall have the same rights in such proceeding as such person would have had if the action had continued under this section. Any finding of fact or conclusion of law made in such other proceeding that has become final shall be conclusive on all parties to an action under this section. For purposes of the preceding sentence, a finding or conclusion is final if it has been finally determined on appeal to the appropriate court of the United States, if all time for filing such an appeal with respect to the finding or conclusion has expired, or if the finding or conclusion is not subject to judicial review.

(d) **Award to qui tam plaintiff.** (1) If the Government proceeds with an action brought by a person under subsection (b), such person shall, subject to the second sentence of this paragraph, receive at least 15 percent but not more than 25 percent of the proceeds of the action or settlement of the claim, depending upon the extent to which the person substantially contributed to the prosecution of the action. Where the action is one which the court finds to be based primarily on disclosures of specific information (other than information provided by the person bringing the action) relating to allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, the court may award such sums as it considers appropriate, but in no case more than 10 percent of the proceeds, taking into account the significance of the information and the role of the person bringing the action in advancing the case to litigation. Any payment to a person under the first or second sentence of this paragraph shall be made from the proceeds. Any such person shall also receive an amount for reasonable expenses which the court finds to have been necessarily incurred, plus reasonable attorneys' fees and costs. All such expenses, fees, and costs shall be awarded against the defendant.

(2) If the Government does not proceed with an action under this section, the person bringing the action or settling the claim shall receive an amount which the court decides is reasonable for collecting

the civil penalty and damages. The amount shall be not less than 25 percent and not more than 30 percent of the proceeds of the action or settlement and shall be paid out of such proceeds. Such person shall also receive an amount for reasonable expenses which the court finds to have been necessarily incurred, plus reasonable attorneys' fees and costs. All such expenses, fees, and costs shall be awarded against the defendant.

(3) Whether or not the Government proceeds with the action, if the court finds that the action was brought by a person who planned and initiated the violation of section 3729 upon which the action was brought, then the court may, to the extent the court considers appropriate, reduce the share of the proceeds of the action which the person would otherwise receive under paragraph (1) or (2) of this subsection, taking into account the role of that person in advancing the case to litigation and any relevant circumstances pertaining to the violation. If the person bringing the action is convicted of criminal conduct arising from his or her role in the violation of section 3729, that person shall be dismissed from the civil action and shall not receive any share of the proceeds of the action. Such dismissal shall not prejudice the right of the United States to continue the action, represented by the Department of Justice.

(4) If the Government does not proceed with the action and the person bringing the action conducts the action, the court may award to the defendant its reasonable attorneys' fees and expenses if the defendant prevails in the action and the court finds that the claim of the person bringing the action was clearly frivolous, clearly vexatious, or brought primarily for purposes of harassment.

(e) **Certain actions barred.** (1) No court shall have jurisdiction over an action brought by a former or present member of the armed forces under subsection (b) of this section against a member of the armed forces arising out of such person's service in the armed forces.

(2)(A) No court shall have jurisdiction over an action brought under subsection (b) against a Member of Congress, a member of the judiciary, or a senior executive branch official if the action is based on evidence or information known to the Government when the action was brought.

(B) For purposes of this paragraph, "senior executive branch official" means any officer or employee listed in [section] paragraphs (1) through (8) of section 101(f) of the Ethics in Government Act of 1978 (5 U.S.C.App.).

(3) In no event may a person bring an action under subsection (b) which is based upon allegations or transactions which are the subject of a civil suit or an administrative civil money penalty proceeding in which the Government is already a party.

(4)(A) No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

(B) For purposes of this paragraph, "original source" means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.

(f) **Government not liable for certain expenses.** The Government is not liable for expenses which a person incurs in bringing an action under this section.

(g) **Fees and expenses to prevailing defendant.** In civil actions brought under this section by the United States, the provisions of section 2412(d) of title 28 shall apply.

(h) Any employee who is discharged, demoted, suspended, threatened, harassed, or in

any other manner discriminated against in the terms and conditions of employment by his or her employer because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section, shall be entitled to all relief necessary to make the employee whole. Such relief shall include reinstatement with the same seniority status such employee would have had but for the discrimination, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees. An employee may bring an action in the appropriate district court of the United States for the relief provided in this subsection.

(As amended Oct. 27, 1986, P.L. 99–562, §§ 3, 4, 100 Stat. 3154, 3157; Nov. 19, 1988, P.L. 100–700, § 9, 102 Stat. 4638; May 4, 1990, P.L. 101–280, § 10(a), 104 Stat. 162.)

### HISTORY; ANCILLARY LAWS AND DIRECTIVES

**Explanatory notes:**

The legislative instructions for § 9(b) of Act Nov. 19, 1988, P.L. 100–700 directed amendments to 28 USCS § 3730; however, such amendments were executed to 31 USCS § 3730 as the probable intent of Congress.

The word "section" has been enclosed in brackets in subsec. (e)(2)(B) to indicate the probable intent of Congress to have deleted such word in the amendment made by Act May 4, 1990.

**Amendments:**

**1986.** Act Oct. 27, 1986, substituted this section for one which read:

"(a) The Attorney General diligently shall investigate a violation under section 3729 of this title. If the Attorney General finds that a person has violated or is violating section 3729, the Attorney General may bring a civil action under this section against the person. The person may be arrested and bail set for an amount of not more than $2,000 and 2 times the amount of damages sworn to in an affidavit of the Attorney General.

"(b)(1) A person may bring a civil action for a violation of section 3729 of this title for the person and for the United States Government. The action shall be brought in the name of the Government. The district courts of the United States have jurisdiction of the action. Trial is in the judicial district within whose jurisdictional limits the person charged with a violation is found or the violation occurs. An action may be dismissed only if the court and the Attorney General give written consent and their reasons for consenting.